No. 29,068.

MARY E. PATTISON, *Appellant,* v. FREDERICK A. PATTISON, OLIVE A. TAYLOR, and FREDERICK A. PATTISON, as Executor, etc., et al., *Appellees.*

(283 Pac. 483.)

Opinion filed January 11, 1930.

*W. L. Cunningham, D. Arthur Walker, Fred G. Leach* and *Wm. E. Cunningham, Jr.,* all of Arkansas City, for the appellant.

*Horatio S. Hines,* of Arkansas City, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: Plaintiff brought this action to partition certain real estate devised by her deceased husband to defendants, who were

his children by a former marriage. The defense to the action was an antenuptial contract between plaintiff and the testator. Plaintiff replied that just prior to her marriage she signed the antenuptial contract without knowing its purport, in reliance on a statement of her affianced husband that it related to the possibility of their subsequent divorce, and—

"That prior to signing her name to said contract she had no information as to the extent or value of the property owned by said James Pattison at that time, save and except as the same was enumerated in said contract, the value of which she did not at that time know, nor was she advised thereof by the said James Pattison or by any other person on his behalf, nor did she at any time ascertain the value of the notes or other obligations due him, the said James Pattison, or the money he had in bank or any other property owned by him, nor was she informed thereof by the said James Pattison prior to the time she signed her name to said contract."

In her reply plaintiff also alleged that shortly after the marriage her husband became sick and never recovered; that during his lingering illness he required plaintiff's constant attention; that she had to contribute from her own small means to their joint support; that her husband admitted to her that her signature to the contract was not fairly obtained; and that they mutually orally agreed to, and did cancel, rescind and set aside the antenuptial contract.

The contract itself, a copy of which was attached to defendants' answer, in part, reads:

"This article of agreement entered into this 28th day of April, 1924, by and between James Pattison, now residing in Arkansas City, Cowley county, Kansas, and of the age of 70 years; and Mary E. Ford, former wife of H. S. Ford, and now residing in Arkansas City, Cowley county, Kansas.

"Know all men by these presents, that whereas, the said parties are at an age and state in life, and each being single and unmarried, and realizing that it were better for men and women to not remain single and apart from the world and being desirous of being united in the holy bonds of matrimony, to provide each for the other, an aid and assistant to each other, to love, cherish and protect each other in sickness or health. And each other parties hereto being the owners of certain real estate hereinafter described and property and effects being of a personal nature; and in order that they and each of them may hold their property separate and apart from marriage relations and shall not have any right to the property of the other except and wherein that each party shall share alike the profits and earnings of their joint efforts. And be it distinctly understood that the earnings of the property, be it real or mixed or moneys, shall remain the sole property of each of the parties as their own and that at the death of either of the parties or both shall remain *statu quo*.

"And be it further understood by each of the parties that James Pattison

is the owner of certain real estate towit: [80 acres of land (described) in Sumner county, 4 separate pieces of real property (described) in Arkansas City.]

"And that he is possessor of certain notes and other outstanding obligations due him and moneys in the bank and he is possessed of other properties too numerous to mention.

"And whereas the said Mary E. Ford, former wife of H. S. Ford, is the owner of lots ten (10), block one hundred seventy-two (172) in M. R. Leonard's addition to Arkansas City, Cowley county, Kansas, according to the plat thereof.

"And it is further understood that any improvements upon the real estate of either of the parties shall be considered as part of the real estate and all improvements thereon made upon any of the real estate shall be the property of each individual owner.

"It is further stipulated by the parties that as a part of this contract the said James Pattison shall pay all taxes, assessments and amercements that may be levied upon all of the property, including the property of Mary E. Ford, and shall pay for the upkeep of the property of Mary E. Ford during the life of this contract so far as the same shall be agreeable to each party."

When the cause came on for trial, counsel for the respective parties made opening statements. Part of the statement of plaintiff's counsel reads:

"As a reply to that we set up as it shows in the contract that these parties were engaged to be married at the time the same was entered into, and that it was void because James Pattison didn't disclose to the wife the full nature and value of his property, and there was no provision made in the contract for the wife, and that unless a full disclosure was made of the value of the property, and all about it at the time, then it is presumptively a concealment and is fraudulent and void, and by her can be set aside.

"We further claim in our answer that at the time this matter came up, at the time, after they were engaged, and I think the very day they were going to be married he brought the contract to Mrs. Ford to be signed. She refused to sign it, saying she didn't understand it. Then he went back, as he told her, to see Judge Hines, or rather he told her at first that it only applied in case of divorce, saying that he had had some trouble with his first wife in a divorce proceeding and had to pay her alimony and he wanted a contract so that if she got a divorce he wouldn't have to pay alimony. He went back to Judge Hines, as he told her, and that Judge Hines told him that was all it meant, that it only applied in case of divorce. She relied upon what he told her in that respect. And so they signed the contract.

"We will show that the mere fact that the property was listed in the contract isn't evidence that she knew the extent of it.

"Shortly after their marriage James Pattison became very sick and she was obliged to take care of him constantly, and that by mutual agreement this contract was set aside."

Part of the opening statement of defendants' counsel reads:

"Mr. Cunningham has covered pretty well our defense, but there is no allegation of fraud alleged on the part of the plaintiff in procuring this antenuptial contract. They simply say that he didn't disclose all his property. Now I will call your attention to that part of the contract which says—they go on and describe a lot of property, and that in addition to that he is possessed of certain notices, and that he was possessed of other properties too numerous to mention, thereby challenging her attention in the contract itself. . . .

"Of course, a parol agreement to annul an antenuptial contract is void."

At the completion of the opening statements defendants moved for judgment on the pleadings and opening statements. The trial court sustained that motion, nonsuited the plaintiff, and entered judgment for defendants.

Plaintiff appeals.

Antenuptial contracts are valid when understandingly and fairly made. (*McVicar v. McVicar,* 128 Kan. 394, 399 and citations, 278 Pac. 36.) But plaintiff pleaded that she did not understand this contract, that she was deceived as to its contents. She also alleged that it was not fairly made, in that she was not apprised of the amount of her affianced husband's personal worth. The contract itself gave little hint of it; and by its terms she was to get nothing whatever as a widow's share in his estate if she survived him and nothing substantial for her renunciation thereof.

Prerequisites to the validity of antenuptial contracts are that they be entered into in good faith, and that they be reasonable and just in their provisions, considering the circumstances of the contracting parties at the time. (*Matney v. Linn,* 59 Kan. 613, 54 Pac. 668.)

In *Gordon v. Munn,* 87 Kan. 624, 125 Pac. 11, it was held:

"If the intended wife is competent to make a contract and has a fair and adequate knowledge concerning the future husband's property when she enters into an antenuptial agreement, which is free from deceit or fraud, it should not be set aside merely because the court or jury find that the provision made for her is in great disproportion to his property." (Syl. ¶ 5.)

In *Watson v. Watson,* 104 Kan. 578, 583, 180 Pac. 242, it was said:

"The rule seems to be well settled that if unreasonable inadequacy or disproportion appears, the presumption of concealment is raised, and the burden is upon the husband, or those claiming under him, to show full disclosure. The relation between those about to become husband and wife is deemed one of unbounded confidence, especially on the part of the woman. (13 R. C. L. 1034, § 54.)

" 'Good faith is the cardinal principle in such contracts. If the provision made for the wife is unreasonably disproportionate to the means of the hus-

band, the presumption of designed concealment is raised, and the burden of disproving the same is upon him.' (21 Cyc. 1250.)"

See, also, *Watson v. Watson,* 106 Kan. 693, 182 Pac. 643.

In the briefs of counsel it is intimated that James Pattison had an estate worth $40,000. Counsel for appellee say:

"It is clear that a man 70 years of age, who in a very short time thereafter was taken sick from which sickness he never recovered, did not intend to allow his spouse to inherit the one-half of his estate and for that reason he wanted to protect his heirs by an antenuptial contract."

The safe and certain way to have safeguarded that matter was for Pattison to have dealt fairly with his affianced bride, to have made a fair and reasonable provision for her out of his estate in consonance with his and her financial circumstances, and to have made sure that she understood what she was doing. An excellent and seemly course would have been to see to it that plaintiff had independent advice before she put her hand to that contract. It was tactless, if not manifestly unfair, to present to her for her signature on her wedding day this antenuptial contract of which she had no previous intimation and as to the effect of which she had no understanding. That, at least, is the substance of her pleading and the opening statement of her counsel. This court holds that a cause of action was stated in plaintiff's behalf.

Counsel for appellee invoke the rule that written instruments cannot be varied by oral testimony and say plaintiff did not plead fraud. She alleged facts which amount to fraud if they are proved, which, of course, would sweep aside the rule concerning the invulnerability of written instruments against oral testimony tending to discredit them.

In the opening statement of counsel for defendants it was naively remarked:

"Of course, a parol agreement to annul an antenuptial contract is void."

In *Hoard v. Jones,* 119 Kan. 138, 237 Pac. 888, it was said:

"Antenuptial agreements are governed as to their execution (*Brown v. Weld,* 5 Kan. App. 341) by the statute of frauds (R. S. 33-106), and to be enforceable by action must be in writing (*Breen v. Davies,* 99 Kan. 110, 160 Pac. 997), unless fully performed. (*Weld v. Weld,* 71 Kan. 622, 81 Pac. 183.) . . . This is not true with a revocation. The statute of frauds applies to the making of enforceable contracts, not to their revocation, hence, though the original contract must be in writing to be enforceable under the statute of frauds, an absolute revocation of such a contract may be by parol. (*Ely v. Jones,* 101 Kan. 572, 168 Pac. 1102.)" (p. 153.)

Any difficulty which may confront the plaintiff on this point will not be with the law but with her proof. In *Eberhart v. Rath*, 89 Kan. 329, 131 Pac. 604, it was said:

"The surviving husband was incompetent to testify to a conversation with his wife, since deceased, by which he claimed that the postnuptial contract between them had been abrogated. His offer to give such testimony was properly excluded. (Civ. code, § 320; *Dennis v. Perkins*, 88 Kan. 428, 437, 129 Pac. 165.)" (p. 337.)

The judgment of the district court is reversed and the cause remanded with instructions to set aside its ruling on the pleadings and opening statements, and to proceed with the cause.

JOCHEMS, J., not participating.