HANNAH J. MARTIN, Appellee, vs. FRED COLLISON *et al.* Appellants.

*Opinion filed December 16, 1914.*

1. ANTE-NUPTIAL CONTRACTS—*after a marriage engagement the relationship of the parties is fiduciary.* After a marriage engagement is entered into, the relationship between the parties is a confidential and fiduciary one, requiring just and fair dealing.

2. SAME—*complainant must prove allegation that marriage engagement had been entered into.* The complainant in a bill to set aside an ante-nuptial contract must prove the allegation of her bill that a marriage engagement had been entered into before the contract was made, otherwise no fiduciary relation is established, and the defendants are not called upon to prove that complainant knew the extent and value of the property, or circumstances sufficient to charge her with knowledge.

3. SAME—*failure to expressly deny material allegation of bill does not obviate necessity of proof.* An allegation in a bill to set aside an ante-nuptial contract, that an engagement of marriage had been entered into before the contract was made, is a material

one, and the failure of the answer to expressly deny the allegation does not admit it nor relieve the complainant from the duty of proving it.

4. SAME—*when recital of contract does not show existence of marriage engagement.* A recital in an ante-nuptial contract that the "parties are about to enter into a contract of marriage," does not show that an engagement of marriage had existed before the contract was made.

5. SAME—*when sale of part of property does not rescind ante-nuptial contract.* The fact that the wife voluntarily joins the husband in a conveyance of two vacant lots which were a part of the homestead premises, which the wife was to have the use of for life according to the provisions of an ante-nuptial contract, amounts only to a waiver by the wife, as to such lots, of the provisions of the contract but does not operate to rescind the contract, even though it is not shown she received any part of the consideration.

APPEAL from the Circuit Court of Ford county; the Hon. GEORGE W. PATTON, Judge, presiding.

SCHNEIDER & SCHNEIDER, and BARRY & MORRISSEY, for appellants.

CLOUD & THOMPSON, for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

Appellee, Hannah J. Martin, filed her bill in chancery in the circuit court of Ford county against appellants, Fred Collison and G. W. Karr, as executors of the will of Josephus Martin, deceased, and certain children and grand-children of the testator, being the devisees and heirs of said Martin, to set aside an ante-nuptial contract entered into between appellee and Martin September 4, 1894.

The bill, as amended, avers appellee was married to said Josephus Martin September 5, 1894, at Paxton, Illinois, and lived with him until his death, in January, 1909, and that after her engagement to said Martin, and on the day before the marriage, she and said Martin entered into an ante-nuptial agreement for the purpose of making suitable

provision for appellee in the event she survived said Martin. The agreement is as follows:

"Ante-nuptial agreement or contract made and entered into this fourth day of September, A. D. 1894, by and between Josephus Martin, of Paxton, Ford county, Illinois, as party of the first part, and Hannah J. Amm, of Patton township, Ford county, Illinois, as party of the second part.

"That whereas the parties hereto are about to enter into a contract of marriage; and whereas each of the parties hereto have heretofore been married and each of said parties have children by said former marriage; and whereas each of the parties hereto have property, real and personal, and they desire, in contemplation of entering into a marriage contract, to settle and adjust all property rights that each may have or claim in the property of the other, and determine and declare what rights, if any, each of them shall have in the property of the other, in view of the consummation of such marriage contract, in case of the death of either after such marriage contract is entered into:

"Therefore this agreement witnesseth: That in consideration of said marriage contract proposed to be entered into by the parties hereto, that Josephus Martin, party of the first part, covenants and agrees with the party of the second part that in case she survives him as his widow she shall have the use and enjoyment of his homestead property situated in Paxton, Ford county, Illinois, and described as the east half of lot 11 and lots 12, 13, 14, 15 and 16 in block 24, in original town of Prospect City, (now city of Paxton,) east of Illinois Central railroad, for the full term of her natural life. She shall also receive from his estate the sum of $2500, to be paid to her within one year after his death.

"It is further covenanted and agreed between the parties hereto that the giving and granting of the use of the homestead property to the party of the second part for the term of her natural life and the payment to her of the sum of $2500 out of the estate of the party of the first part, as above agreed, shall be in lieu of all claims that the party of the second part, as surviving widow, might have or make or claim in the estate of the party of the first part, and shall be in lieu of all claims for dower in any real estate of which the party of the first part may die seized, and in lieu and satisfaction of any claims she might make for widow's award or any other claims she might have or make in and to his estate, and that all the real and personal property of which the party of the first part shall die seized, except as to the homestead above described, and all personal property of which the party of the first part shall die possessed, except as to the sum of $2500 above provided, shall descend from the party of the first part to his children or as he may direct by will, the same as if the con-

tract of marriage contemplated had never been entered into and the same as if the party of the first part had left him surviving him no widow.

"It is further covenanted and agreed by and between the parties hereto that all the property, real and personal, of which the party of the second part may die seized and possessed, shall pass to and descend to her children by her former marriage or as she may direct by will, without any right or claim made by the party of the first part thereto as surviving husband, and the party of the first part, in case he survives the party of the second part, hereby releases and discharges any and all claims, of whatsoever nature or kind, that he, as surviving husband, might have or make to any of the estate of which the party of the second part may die seized or possessed, be the same real, personal or mixed, including all dower rights or other rights that he could have or claim or make. And the party of the second part accepts of the provisions herein made for her, in case she survives the party of the first part, in lieu and in full satisfaction of all dower rights and all rights of widow's award, and all other rights or claims, of whatsoever nature, that she could have or make or claim, as surviving widow, in and to the estate of the party of the first part.

"This ante-nuptial agreement is executed by the parties hereto in duplicate, and by them delivered on the day and year above written and before the consummation of the marriage contract between them.

"In witness whereof the parties hereunto set their hands and seals the day and year first above written.

JOSEPHUS MARTIN, (Seal.)<br>HANNAH J. AMM. (Seal.)"

The bill alleges Josephus Martin represented to appellee that he was a man of some property but not of much wealth, and that he desired to make provision for her in such amount out of his estate as would be consistent with the property owned by him and fair to appellee, and that, relying upon the fairness of Martin and believing in his representation that the provision made by the agreement was fair and just to appellee, she joined with him in its execution. The bill avers that the representations of the said Martin as to his property were untrue; that, in fact, he was a man of wealth, owning farm lands in Illinois of the value of $100,000 and personal property of the value of $75,000, of which appellee only learned after the marriage.

The bill alleges appellee was induced to sign the agreement by fraud and deceit, also that the provisions therein contained were grossly disproportionate to the amount she would have been entitled to by law and were grossly inadequate. The bill alleges that Martin, after the marriage, conveyed a large part of his real estate and that appellee joined with him in the deeds making said conveyances. It is alleged that at the time of Martin's death he was the owner of personal property of the value of $75,000 and real estate consisting of the homestead in Paxton, 307 acres of land in Champaign county, a one-half interest in a lot in Gifford, Champaign county, and also an undivided one-half interest in 240 acres of land in Iroquois county, Illinois, subject to a trust deed to secure the payment of $3400. The bill prays that the agreement be set aside as invalid and that appellee be awarded her interest under the statute. The bill sets out the will of Martin, in which he recites the provision made for his wife in the ante-nuptial agreement and states his intention to be that the property provided for in that agreement was all the interest in his estate appellee should receive. The residue of his estate he devised to his children and grandchildren.

The bill was answered by appellants. Replication was filed and the cause was referred to the master to take the testimony and report his conclusions. The master made no finding as to the value of Josephus Martin's estate at the time the marriage with appellee was entered into or at the time of his death, but reported his conclusion (1) that the provisions made in the ante-nuptial contract were entirely disproportionate to the means of Martin at the time the agreement was made and the marriage took place; (2) that appellants failed to show, by a preponderance of the evidence, that at the time appellee signed the agreement she had full knowledge, or reasonable means of knowing, of the nature, character and value of Martin's property; (3) that by reason of appellants' failure to make such proof the

contract is void; (4) that complainant is entitled to her widow's award, dower, homestead and one-third of the personal estate of Martin after the payment of debts, funeral expenses, widow's award and costs of administration. Exceptions to the master's report by appellants were overruled and a decree was entered in substantial conformity with the master's report. The decree finds that at the time the antenuptial agreement was entered into Martin owned between 1600 and 1700 acres of land, of a value of more than $100,000, and a considerable amount of personal property, but the value of the personal property is not found. Defendants below prosecuted this appeal from that decree.

At the time of the marriage of appellee and Josephus Martin appellee was forty-nine years old and Martin sixty-two years old. Both had been previously married. Appellee had four children by her former marriage, all grown up to manhood and womanhood, and three of them were married at the time of the appellee's marriage to Martin. Martin had five grown children by a former marriage, four of whom were married at the time of his second marriage. He owned in the neighborhood of 1700 acres of farm land in Champaign county, but had left the farm in 1883 and moved to Paxton, Ford county, where he acquired a home, in which he resided until his death. At the time of his marriage to appellee she was living on 160 acres of land in which she had a life estate and which was situated about nine miles from Martin's land. Martin's first wife died in March, 1894, and he and appellee were married in September following. After their marriage appellee lived with her husband in Paxton, where they resided until the husband's death, in January, 1909. At the time of his death Martin still owned 307 acres of the land he owned at the time of the marriage and also the Paxton homestead. After the marriage he acquired some other city property and a one-half interest in 240 acres of land in Iroquois county, subject to an encumbrance of $6500, which he

266 — 11

owned at the time of his death. His personal estate at the time of his death amounted to nearly $50,000.

There was a sharp conflict in the evidence as to whether the appellee had knowledge of the character and value of Josephus Martin's property, or whether the facts and circumstances were such that she ought reasonably to have had such knowledge, at the time the ante-nuptial agreement was made. The decree does not expressly find that a marriage engagement had been entered into between appellee and Martin prior to the execution of the ante-nuptial agreement, but it is based upon that theory. It finds that Martin did not advise appellee of the property he owned, its nature or value, that she did not know its amount or value, and that the circumstances proved were not such that she ought reasonably to have had such knowledge, and that Martin was guilty of such fraud and deceit as rendered the agreement fraudulent and invalid.

The rule is well established that after a marriage engagement is entered into, the relationship between the parties is a confidential or fiduciary one, and the woman is supposed to confide in the man to whom she is betrothed to deal with her fairly and justly. (*Hessick* v. *Hessick,* 169 Ill. 486; *Achilles* v. *Achilles,* 137 id. 589.) It is the contention of appellants that the rule applicable to a fiduciary relation, as to the burden of proof, does not exist in this case for the reason that no such relation is shown to have existed, and because the proof fails to show that any marriage agreement had been entered into between the parties before the ante-nuptial contract was executed. The bill alleges the ante-nuptial contract was made after an engagement to marry had been entered into between the parties. The contract recites that the parties "are about to enter into a contract of marriage." So far as appears from that document no marriage agreement had been entered into before it was signed, and for aught that appears from that instrument its execution was a preliminary step

to the engagement to marry. Whatever may be the usual custom as to the time ante-nuptial agreements are made, it is not universally true that they are made after betrothal. It may well be and undoubtedly is true that a man and woman may contemplate marriage but one or both of them have reasons why it is desirable, not only before entering into the marriage relation but before there is any agreement to marry, to settle the rights of each in the estate and property of the other by an ante-nuptial agreement, and this step precedes and is preliminary to the contract of marriage. In cases of that character there will be no confidential relation existing until after the contemplated contract is made, and the law governing the rights of the parties under such contracts would be the same as is applicable to contracts entered into by persons between whom there exists no confidential or fiduciary relation. Unless such relation existed between appellee and Martin it was not incumbent upon appellants to prove, by a preponderance of the evidence, that appellee knew the extent and value of Martin's property or circumstances sufficient to charge her with such knowledge. It was incumbent upon appellee to prove the allegation of her bill that the ante-nuptial agreement was executed after the parties had entered into an agreement to marry. Unless this allegation was proved no confidential relation was established and the rules applicable to such relation could not properly be applied.

In *Yarde* v. *Yarde*, 187 Ill. 636, a surviving widow sought by bill in chancery to set aside an ante-nuptial agreement made between her and her deceased husband. The bill alleged she was induced to enter into the agreement, after the engagement to be married, by fraud and deceit; that she did not know the extent or value of her intended husband's property, and that the contract did not make suitable provision for her in view of the value of her husband's property. It was contended by the widow

in this court that the parties occupied a fiduciary relation to each other at the time the ante-nuptial agreement was entered into, and that it was incumbent upon the heirs of the deceased husband to prove he fully and fairly informed his intended wife of the character and value of his property. This court held the proof did not sustain the allegation that an engagement to marry existed at the time the ante-nuptial agreement was made, but that it appeared from the evidence there was no agreement to marry except upon the basis of the ante-nuptial contract. It was therefore not a case for the application of the rule for the establishment of the validity of contracts entered into between parties occupying a confidential relation to each other. In such cases it is incumbent upon the party seeking to avoid a contract upon the ground that it was procured by fraud, to prove the fraud. In *Achilles* v. *Achilles, supra,* which was a bill to set aside an ante-nuptial agreement by a surviving widow, it was not claimed there had been a betrothal before the contract was signed, but that, in the language of her counsel, "the negotiations were pending but no agreement to marry had been made." The court held the contract was not signed under the influence of affection and confidence inspired by a marriage engagement. In *Hessick* v. *Hessick, supra,* which also involved the validity of an ante-nuptial agreement, the court, after stating the rule as to the burden of proof where the validity of contracts between parties sustaining confidential relations is involved, said the reason for applying that rule to ante-nuptial contracts is, that after the marriage engagement is entered into the relationship then existing is confidential and the intended wife is supposed to confide in her intended husband.

It is not claimed by appellee that there was any direct proof as to just when the marriage agreement between the parties was made, but it is contended that there is such proof of attentions paid by Josephus Martin, and declarations made by Martin of his intention to marry her, that

it must be fairly presumed that there was an agreement to marry before the execution of the ante-nuptial contract. The proof relied upon is the testimony of witnesses, some of whom had seen appellee and Martin out riding together, some had seen them together at a certain picnic, and others who had seen them together on one occasion when Martin took appellee with him when he went to call upon one of his tenants. One witness had seen them riding together three or four times, but, as we understand the testimony, none of the others had seen them together on more than one occasion, and several of them testified to the same occasion, which was a certain Sunday picnic. One witness testified that on his way home from the picnic he saw Martin's team tied at appellee's place. One witness testified Martin talked to him a number of times about marrying the appellee and said he had taken her out riding. He did not testify to Martin's making statements that they were engaged or had agreed to marry each other. In an action for breach of promise, where the making of a contract of marriage is affirmed on one side and denied on the other, proof of facts and circumstances and the relation and conduct of the parties toward each other may be considered in determining whether the making of the agreement has been established. In such cases the circumstances are proven to corroborate the testimony of plaintiff of the existence of a marriage contract. Here, however, appellee being an incompetent witness, there is no direct testimony as to the time the agreement was made. We do not think the circumstances proved in this record are alone sufficient to establish the allegation of the bill that a marriage agreement was entered into between the parties before the ante-nuptial contract was executed. It may be conceded that both parties had matrimony in view when they were seen riding together or attending a picnic, still there is nothing in all the circumstances proved which would warrant finding

that they actually entered into an agreement to marry at any time before the execution of the ante-nuptial contract.

Appellee insists that appellants cannot raise the question whether the allegation of the bill that the marriage agreement was made before the ante-nuptial contract was entered into was true, for the reason that the answer does not deny the allegation. The allegation was a material one, and the failure to expressly deny it in the answer neither admitted it nor relieved appellee from the duty of proving it. *Shuld* v. *Wilson,* 225 Ill. 336; *Howard* v. *Boyle,* 248 id. 251.

Appellee excepted to the report of the master for his refusal to hold that the sale and conveyance by Martin, in his lifetime, of certain lots which were a part of the homestead property operated to rescind the ante-nuptial agreement or render it unenforceable. At the time the parties were married there were five and one-half lots constituting the homestead premises. After the marriage Martin sold a lot and one-half at one time for $1000 and one-half lot at another time for $400. Appellee joined him in conveying the property, but, so far as the proof showed, received no part of the consideration. The premises sold appear to have been vacant property, the residence and buildings being on the lots which were not sold. The chancellor overruled the exceptions and held that the conveyances did not operate to rescind the ante-nuptial contract, and appellee has assigned cross-errors upon that finding. We are of opinion the decree was right upon that question. By voluntarily joining with her husband in the conveyance appellee waived the benefit of the ante-nuptial contract as to the property conveyed. (*Becker* v. *Becker,* 250 Ill. 117.) It is claimed appellee did not willingly consent to the conveyances. The proof shows she at first made some objections to the conveyances but that she withdrew her objections and voluntarily united with her husband in the deeds. There remained to her the residence and three lots, which consti-

tuted the home. We think it manifest that neither she nor her husband had any thought or intention, at the time the deeds were made, of rescinding the ante-nuptial agreement.

Our conclusion is that the evidence does not support the finding of the chancellor that a confidential relation existed between the parties at the time the ante-nuptial agreement was executed, and it is therefore unnecessary to pass upon other questions raised and discussed in the briefs.

The decree is reversed and the cause remanded.

*Reversed and remanded.*